# UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

In the Matter of the Search of

(Name, Address or brief description of person or property to be searched)

The Premises Known as
166 Valley Street, Apt. 411,
Providence, RI

*APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT*

M. J. No. 1:05-M-130M

I, Andrew Simmons, being duly sworn, depose and say:

I am a(n) **Task Force Agent with the U.S. Drug Enforcement Administration** and have reason to believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

166 Valley Street, Apt. 411, Providence, RI, more fully described in Attachment A, which is attached hereto and incorporated by reference herein

in the ________ District of **Rhode Island** there is now concealed a certain person or property, namely (describe the person or property)

the items described in Attachment B, which is attached hereto and incorporated by reference herein

which are (give alleged ground for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence and instrumentalities

of violations of Title **21** United States Code, Section(s) **846**.

The facts to support the issuance of a Search Warrant are as follows:

**See attached Affidavit of Andrew Simmons**

Continued on the attached sheet and made a part hereof: X Yes ☐ No

Signature of Affiant
Andrew Simmons
Task Force Agent - DEA

Sworn to before me and subscribed in my presence,

November 8, 2005 at Providence, Rhode Island
Date City and State

Signature of Judicial Officer
DAVID L. MARTIN
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

The Target Premises is described as follows:

166 Valley Street, Providence, RI, is a brick, multi-unit apartment building called the "Rising Sun Mills Apartments". The structure has the words "Rising Sun Mills" is red lettering affixed above the front door. The structure is located on Valley Street between Atwells Avenue and Broadway in Providence, RI. The Target Premises is Apartment 411 in the Rising Sun Mills apartment building.

**ATTACHMENT B**

1. Cocaine.

2. Paraphernalia for the packaging, processing and distribution of controlled substances such as cocaine, to include packaging materials, plastic bags, scales, "cutting" agents used to dilute/extend cocaine prior to sale, and electronic pagers and cellular telephones used to communicate with drug associates.

3. Books, records, notes, ledgers, and any other papers or records relating to the purchase or distribution of heroin and/or firearms, and/or records or electronic devices reflecting the identity of co-conspirators and drug and/or firearm customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, and/or telephone bills.

4. Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto, or safes for keeping the same. Such items include, but are not limited to jewelry, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

5. Documents reflecting dominion and/or control of 166 Valley Street, Apt. 411, Providence, RI, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control by DAVID VIEIRA and/or GARY SOARES over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Photographs of individuals, property, and/or illegal controlled substances.

8. Firearms, including ammunition, magazines, holsters, and any components of firearms.

1:05-M-130 M

**AFFIDAVIT OF ANDREW SIMMONS**

I, Andrew Simmons, a New Bedford Detective currently assigned as a Federal Task Force Agent (TFA) to the United States Drug Enforcement Administration (DEA) New Bedford Resident Office, being duly sworn, state:

1. I am a Task Force Agent with the DEA and have been assigned to the New Bedford Resident Office (NBRO) since April 2004. Prior to my present assignment, I was assigned for approximately one year as a Narcotics Detective to the New Bedford Police Department Organized Crime Intelligence Bureau. Prior to that, I have been assigned to the Uniform Patrol Division of the New Bedford Police Department since February of 1999. I have an Associates of Science degree in Criminal Justice from Bristol Community College.

2. During my law enforcement career, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, cocaine base, also known as "crack cocaine", heroin, and other substances that are sold in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846. I have also operated in an undercover capacity in numerous investigations. I have assisted in numerous other investigations in different capacities, such as surveillance, execution of search warrants, execution of arrest warrants, interception of wire communications

and other investigative methods. Those investigations have resulted in arrests and convictions for violations of drug laws, seizures of drugs, firearms, and forfeiture of money, and motor vehicles.

3. Through my training, education and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am also familiar with various items used to compound, process, deliver, and serve as containers for cocaine, heroin, and other controlled substances. I also am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, and other means to facilitate their illegal activities. I also am familiar with the vernacular or street-names for users and distributors of controlled substances, and the methods by which such persons attempt to disguise the subjects of their conversations and operations. Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

4. I am submitting this affidavit in support of an application for the issuance of a search warrant authorizing the search of a residence located at 166 Valley Street, Apartment 4, Providence, RI, (hereinafter "the Target Premises," more fully described below). As described more fully below, Target Premises is the residence of David VIERA, a/k/a "Oofa", and Gary SOARES, and is the location where they package cocaine for re-sale. For the reasons explained herein, I submit that there is probable cause to believe that evidence of violations of the federal drugs laws, including 21 U.S.C. 846, exists in the Target Premises, including, but not limited to, cocaine; drug packaging materials, cutting agents, and other paraphernalia; U.S. currency obtained as the result of drug sales; documents and other records reflecting income from the purchases and sales of heroin, cocaine, or other drugs; documents and other records reflecting telephone numbers and/or addresses for co-conspirators, suppliers, and customers; and telephones or communication devices used to facilitate the distribution of narcotics.

5. This affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of violations of the federal drug laws is located in the Target Premises. Accordingly, I have not included each and every fact known to myself and other law enforcement officers involved in this investigation. As a result of my personal participation in

the investigation, interviews with and analysis of reports submitted by other law enforcement personnel, interviews of confidential sources, and my consultations with other law enforcement officers, I am familiar with this investigation.

6. The Target Premises is described as follows:

> 166 Valley Street, Providence, RI, is a brick, multi-unit apartment building called the "Rising Sun Mills Apartments". The structure has the words "Rising Sun Mills" is red lettering affixed above the front door. The structure is located on Valley Street between Atwells Avenue and Broadway in Providence, RI. The Target Premises is Apartment 411 in the Rising Sun Mills apartment building.

Two photographs of the Target Premises are attached to this affidavit as Exhibit A.

**A. <u>INTRODUCTION</u>**

7. In November 2004, a criminal investigation was initiated into the narcotics trafficking activities of David VIEIRA and his drug trafficking associates, including Gary SOARES, Keith LINDO, David MEDEIROS a/k/a "Weasel," Matthew FERNANDES, and Ray DeMELO, who were believed to be distributing cocaine in the area of New Bedford, Southeastern Massachusetts, and Rhode Island. From Spring 2005 to Fall 2005, a confidential source ("CS") working with the DEA made seven controlled purchases of cocaine from VIEIRA and VIEIRA's drug trafficking associates. Each of the controlled buys was set up by one or more consensually recorded calls with VIEIRA or one of VIEIRA's "workers". Prior to each of the controlled buys, agents met with

the CS and searched the CS and its vehicle. The CS was then provided with a recording device and a set amount of Official Government Currency ("OGC") to make the controlled purchases. Each of the controlled buys was surveilled by law enforcement and consensually recorded. After each of the buys, agents retrieved the purchased cocaine and the recording device from the CS, and sent the cocaine to the DEA's Northeast Regional Laboratory.

8. The controlled buys ranged from a couple grams to a couple ounces. During these buys, the CS typically contacted VIEIRA and then VIEIRA, SOARES, LINDO, or MEDEIROS would make the delivery. During one of the buys, VIEIRA told the CS that Keith LINDO worked for VIEIRA and also gave the CS the phone numbers of his other "workers", including Gary SOARES, Matthew FERNANDES, Ray DeMELO, David MEDEIROS, and LINDO, as well as VIEIRA's new number. During several of these controlled buys, surveillance agents saw VIEIRA and SOARES leave the Target Premises, stop briefly at their suspected stash location (87 Rockland Street, New Bedford, MA), and then go to the meet location to make the sale to the CS.

9. The CS has been a documented informant since Fall 2004. CS has been documented DEA informant since June 2005. CS has provided reliable information in the past which has led to numerous arrests, the apprehension of fugitives, and seizures of narcotics and cash. The information provided by CS in this

investigation has been proven reliable throughout the course of the investigation.

**B. THE WIRETAP INVESTIGATION**

10. On September 28, 2005, a request for the interception of a cellular telephone used by David VIEIRA (target telephone # 3) was granted by the United States District Court for the District of Massachusetts. The authorization to intercept target telephone # 3 was re-authorized on October 21, 2005 and the interception of VIEIRA's cellular telephone is ongoing to present. During the course of the interception of target telephone # 3, numerous conversations were intercepted which illustrate that David VIEIRA operates a cocaine distribution business and that GARY SOARES, Keith LINDO, David MEDEIROS, Ray DeMELO and Matt FERNANDES work for VIEIRA in his cocaine distribution business. A brief summary of representative intercepted calls is provided below.

11. On September 29, 2005, at approximately 12:55 p.m., SOARES called VIEIRA on target telephone # 3 from telephone number 508-509-1989. [This phone number is subscribed to Gary SOARES at 20 Sherman Street in New Bedford, MA (SOARES license also comes back to this address)]. SOARES told VIEIRA that he thought he was being followed. VIEIRA asked if he was followed from the "spot" and SOARES said, "No, no, not at all." VIEIRA said he would be at the bar in approximately five minutes. Based

on my training and experience, and familiarity with this investigation, I believe that SOARES thought he was being followed by narcotics detectives; that "spot" refers to a stash house; that VIEIRA wanted to make sure SOARES was not followed from their stash house; and that the two would meet at the San Paulo Café in approximately five minutes.

12. On September 29, 2005, at approximately 2:28 p.m., LINDO called VIEIRA on target telephone # 3 from IMSI 316010005401840. [Agents listening to these calls were familiar with LINDO's voice and identified him throughout the wiretap investigation. Agents were also familiar with him by sight and identified him on surveillance during the investigation.] LINDO asked VIEIRA, "Yo, if I'm straight today, can I see you today?" VIEIRA said "yes" and LINDO said he would see him later on. At approximately 3:15 p.m., VIEIRA called LINDO back and said that he was not prepared to "do that today, there's too many Narcs around." LINDO asked if he could "do that later on tonight" and said it was "for him and Gary." At approximately 6:35 p.m., SOARES called VIEIRA on target telephone # 3 from IMSI 316010009837238. VIEIRA told SOARES to come "to where he is" because there's a scale there and they can "cut it in half." SOARES told VIEIRA to "just take a fat bud" and VIEIRA told SOARES to come over and split it. Based on my training and experience and familiarity with this investigation, I believe

that LINDO contacted VIEIRA in order to pay VIEIRA money owed to him and to obtain a new supply of cocaine; that VIEIRA did not want to conduct the transaction until later in the evening because he believed that there were narcotics detectives in the area; that VIEIRA and LINDO arranged to meet later in the day; that VIEIRA and SOARES wanted to split a bag of marijuana that was kept at their stash location; and that VIEIRA wanted to weigh the bag of marijuana while SOARES wanted VIEIRA to just take an amount without weighing it.

13. On September 30, 2005, at approximately 12:20 p.m., LINDO called VIEIRA on target telephone #3 from IMSI #316010005401840. LINDO said "they are going to be home in an hour or so" and that he wanted to put it away before they got home. VIEIRA asked if LINDO had the "four g's." LINDO said he had 3600 and that he just needed to make a few more sales. Based on my training and experience, I believe that "four g's" is code for $4,000 and that LINDO owed VIEIRA $4,000 for cocaine that VIEIRA had fronted to LINDO.

14. On September 30, 2005, at approximately 10:02 p.m., SOARES called VIEIRA on target telephone # 3. SOARES told VIEIRA that he got rid of three more of "those" and was getting rid of another one at 10:30. As the call ended, VIEIRA asked SOARES, "What do I still got over there, three and a half ounces?" I believe that SOARES was explaining to VIEIRA that he had sold

three specific amounts of cocaine and was planning on selling another at 10:30 p.m., and that VIEIRA was asking SOARES if he had three and a half ounces of cocaine left at 87 Rockland Street, which agents previously identified during surveillance as a stash location.

15. On October 2, 2005, at approximately 2:40 p.m., VIEIRA called SOARES and SOARES said that he thought "he had more pieces when he came down, so he might be back early." VIEIRA said that there was "stuff at the spot." SOARES said that he was almost selling out of the "pieces at the spot." VIEIRA told him that he had a "bag with trees and pieces." I believe, based on previous surveillance, that VIEIRA and SOARES live together in Providence, Rhode Island; that "pieces" is code for cocaine; that the "spot" refers to 87 Rockland Street, New Bedford; that VIEIRA and SOARES are storing their cocaine there; and that SOARES had come to New Bedford from Providence to sell cocaine.

16. On October 3, 2005 and October 4, 2005, a series of conversations occurred between VIEIRA and SOARES, and VIEIRA and LINDO, regarding a four "onion" or four ounce cocaine transaction. I believe that the conversations indicated that LINDO had a customer who wanted four (4) ounces of cocaine and that SOARES was going to get the cocaine from VIEIRA and deliver it to LINDO for further distribution. The conversations indicated that the transaction between SOARES and LINDO was to

take place in the morning on October 4, 2005.

17. On October 4, 2005, at approximately 3:15 p.m., VIEIRA called LINDO and asked LINDO for "some dough" because was going to be leaving. LINDO said that someone called for "four onions" and that he could "make a couple of hundred bucks" if VIEIRA gave it to him. I believe that LINDO owed VIEIRA money for cocaine for a transaction that had occurred earlier that day; that "four onions" is code for four ounces of cocaine; and that LINDO had a customer who wanted to purchase four ounces of cocaine.

18. On October 4, 2005, at approximately 6:06 p.m., an outgoing call was placed from VIEIRA on target telephone # 3 to David MEDEIROS at UFMI 180*104*10231. VIEIRA told MEDEIROS that SOARES "made like 31, there's like 36 pieces." VIEIRA said that SOARES was going to give a "g" to VIEIRA and $440 to MEDEIROS. I believe that "36 pieces" is code for 36 bags of cocaine; that "g" is code for one grand, or $1,000; that SOARES was selling the cocaine that MEDEIROS had left under a seat of a four wheel ATV in MEDEIROS's before having his bail revoked on a pending criminal case; and that SOARES was going to pay VIEIRA $1,000 and MEDEIROS $440 with the proceeds from the sales.

19. On October 5, 2005, at approximately 1:55 p.m., VIEIRA called LINDO and LINDO asked VIEIRA, "If I give you like 5 or 55, you won't be able to hit me off again." LINDO continued, "You know I got enough to pay you, it's just with getting rid of that

instead of going to grab that "Ace," I can just give you five or fifty-five, you can hit me off with the whole thing again." VIEIRA said the only way he would do that is if LINDO gave him the rest of the dough before he leaves for Portugal. LINDO said, "you're leaving Tuesday, I got the weekend to come up with fifteen hundred, that's nothing. Alright, I'll do that." LINDO said that would be easier than seeing each other twice. VIEIRA told LINDO to "call me when you're ready" and LINDO said, "Alright, I'll call you as soon as he gets down here. Based on my training and experience, I believe that "Ace" refers to an amount of cocaine; that LINDO wanted to re-up his supply of cocaine from VIEIRA; and that VIEIRA did not want to front LINDO additional cocaine until LINDO paid him for the cocaine that VIEIRA had already fronted to LINDO.

20. On October 6, 2005, at approximately 10:16 a.m., LINDO called VIEIRA and said that he had six thousand and does not owe VIEIRA much. LINDO asked VIEIRA if "that's straight" and told VIEIRA that he would give it to Gary. At approximately 10:36 a.m., LINDO called VIEIRA back and told him that he was "short fifty" on the six "g's" for Gary. LINDO told VIEIRA that he owed him "ten fifty." I believe that six "g's" is code for $6,000 and that VIEIRA enlisted SOARES to collect the money that LINDO owed VIEIRA.

21. On October 11, 2005, surveillance was established on

Keith LINDO. Surveillance agents observed behavior consistent with what agents believed to be a narcotics transaction between LINDO and a customer. The customer of the transaction was stopped, found to be in possession of a white powdery substance which field tested positive for cocaine, and made statements that he had received the cocaine from LINDO. LINDO and his girlfriend Heather Jeronimo were stopped. LINDO was placed under arrest. A search incident to arrest revealed approximately $1,160 in cash and seven (7) plastic bags each containing approximately 1 gram of cocaine.

22. On October 11, 2005, at approximately 8:54 p.m., an outgoing call was placed on target telephone # 3. VIEIRA spoke to Heather Jeronimo who is believed to be the girlfriend of LINDO. VIEIRA and Jeronimo discussed the recent arrest of LINDO. Jeronimo explained that "he had a wad on him and he had six pieces." VIEIRA said "no candy" and Jeronimo said no. VIEIRA stated that "thats a good thing." VIEIRA stated "Gary already has the calls in for the lawyer and all that bull shit if ahhh I can probably have the lawyer in court if Keith already wants him in court I'll have him there." I believe that this conversation concerned the arrest of LINDO; that the "wad" was a reference to the money that was seized; and that the "six pieces" was a reference to the bags of cocaine that were seized. I further believe that VIEIRA's statement regarding contacting an attorney

concerned the fact that VIEIRA was going to arrange for and pay for the attorney for his subordinate dealer.

23. On October 19, 2005, at approximately 10:32 a.m., an outgoing call was placed on target telephone # 3. VIEIRA, who had returned from Portugal, spoke to LINDO. LINDO discussed how much his attorney was charging and explained that the attorney had stated that he wasn't going to charge LINDO the amount that he would charge "David" and "his boys" because LINDO isn't a kilo dealer.

24. On October 19, 2005, at approximately 2:04 p.m., an incoming call was received on target telephone # 3 from (508) 454-6742. VIEIRA spoke to "Eusebio" a/k/a FNU LNU a/k/a "Estebio." "Eusebio" asked for one to be fronted until the following day. VIEIRA is overheard asking SOARES whether SOARES can front "Eusebio" a "piece." SOARES is heard responding no, that he only has a few pieces and then VIEIRA told "Eusebio" "he only has a few of them I'm looking at the pieces right now. VIEIRA explains that SOARES only has "8 pieces" left. VIEIRA explained that SOARES is going to bag up later. VIEIRA told "Eusebio" to contact him if he gets the $40. I believe that this conversation concerned a cocaine transaction; that "Eusebio" wanted VIEIRA to front him a piece of cocaine; that SOARES, who was present with VIEIRA was unwilling to front the cocaine because he only had eight pieces of cocaine with him.

25. On October 21, 2005, at approximately 12:06 a.m., an outgoing call was placed from target telephone # 3 to 508-509-1989. VIEIRA spoke to SOARES. SOARES said that he was still in New Bedford and might just "do that shit early in the morning and head up there with a six, bag up, and come down . . . with you" (i.e., to the Target Premises). SOARES also said he would try "to hit the fucking spot up early" (i.e., go the stash house). Agents believe that "six" is code for 62 grams and that SOARES intended to bring his cocaine to the Target Premises.

26. On October 21, 2005, at approximately 5:04 p.m., an incoming call was received on target telephone #3 from 508-684-0546. VIEIRA spoke to Louie LNU. Louie told VIEIRA that SOARES was not answering his phone. VIEIRA said that he was with SOARES and that they would be at Louie's house in 5-10 minutes. Louie LNU said he wanted "four" and the sooner they got to his house, the sooner they would get the money. I believe that "four" is code for four bags of cocaine and that Louie LNU planned to purchase said amount of cocaine from SOARES and VIEIRA.

27. On October 23, 2005, at approximately 9:41 p.m., VIEIRA called MEDEIROS and told MEDEIROS that he was trying to put "twenty-five G's" in the bank for the lawyer. I believe that "twenty-five G's" is code for $25,000 and that VIEIRA was setting aside that amount of cash to pay for MEDEIROS's lawyer.

28. On October 24, 2005, LINDO called VIEIRA and told LINDO

that VIEIRA's neighbor was bringing him a Glock and a Colt 45 firearm. A few minutes later VIEIRA spoke to LINDO again. VIEIRA told LINDO that he didn't "give a fuck no more" and would go to war. VIEIRA said he would blow their heads off and would bring out the "357 burners." Agents believe that VIEIRA was talking about his enemies and that "357 burners" referred to firearms.

29. On October 24, 2005, Matthew FERNANDES called VIEIRA and VIEIRA said that he would have SOARES give "it to you" and that FERNANDES could "bag it up in my crib" (i.e., the "Target Premises"). VIEIRA also told FERNANDES that he could store it at his house (i.e., the "Target Premises) and "do 10 pieces a day." I believe that VIEIRA had enlisted Matthew FERNANDES to sell cocaine for him and that VIEIRA had offered to let Matthew FERNANDES package it and store it at the Target Premises.

30. Later on October 24, 2005, at VIEIRA called SOARES and SUARES told VIEIRA that he was going to give Matt "my two sixes" and that Matt could take "one of mine" and "I'll keep one of mine." SOARES said that he would have Matt "head up there." Later that day, at approximately 6:54 p.m., VIEIRA talked to MEDEIROS and told him that he almost cut his finger off chopping up "bliz" for Matt. I believe that "sixes" is code for 62 grams; that SOARES and VIEIRA enlisted Matthew FERNANDES to start dealing cocaine again; that "bliz" is code for cocaine; and that

VIEIRA injured his fingered cutting up cocaine for Matthew FERNANDES. Surveillance agents saw FERNANDES meet SOARES and drive toward Providence. Intercepted calls between VIEIRA and FERNADES showed that FERNADES was meeting VIEIRA at the Target Premises, where VIEIRA had hurt his finger while packaging cocaine for FERNANDES.

31. On October 26, 2005, at approximately 1:17 p.m., VIEIRA called SOARES and asked "you want me to bring that six-deuce for you?" SOARES said yes. A short time later VIEIRA and SOARES spoke again. SOARES said he was picking up a sandwich and VIEIRA asked if he should grab the keys and "leave the six-deuce and you give me ten bucks." I believe that "six-deuce" is code for 62 grams of cocaine and that VIEIRA was bringing said amount to SOARES at the Target Premises for him to distribute.

32. On October 26, 2005, at about 1:45 p.m. SOARES called VIEIRA and said that he needed the key to "the spot" because someone was going to be calling him around four o'clock. I believe "the spot" refers to VIEIRA's and SOARES' stash house -- 87 Rockland Street, New Bedford, MA -- and that SOARES needed to gain access to pick up cocaine for a transaction later in the day.

33. On October 26, 2005, at approximately 8:30 p.m., VIEIRA called LINDO and asked LINDO if he had $600 because he just bought a "brand new Glock" for him. VIEIRA said that he just got

a Glock 26, a .40 caliber Glock and a Mac 11. VIEIRA said "my boy is buying brand new shit from the store" and that "he just placed an order for ten more Glocks." I believe that VIEIRA had someone buying new firearms direct from a store for him and that VIEIRA was selling one to LINDO for $600.

34. On October 27, 2005, MEDEIROS called VIEIRA in the morning and VIEIRA told MEDEIROS that he got robbed. VIEIRA said that between him and SOARES they had "fifteen G's dog, stashed nigger" and "bliz probably like ten G's in Bliz nigger." I believe, based on other calls, that VIEIRA believes he was robbed of $500 by a maintenance man; that G is code for $1,000; and that VIEIRA had $15,000 in cash and $10,000-worth of cocaine stashed at the Target Premises.

35. On October 27, 2005, at approximately 2:00 p.m., VIEIRA called SOARES and told SOARES that Armando needed a "quarter piece" and Shiqual needed a "quarter piece." At approximately 3:50 p.m., VIEIRA and SOARES spoke again and SOARES told VIEIRA to call Armando and give him SOARES's number. SOARES said he was there with "it" and Armando was not around. I believe VIEIRA had SOARES make two quarter-ounce sales of cocaine for VIEIRA.

36. Later on October 27, 2005, VIEIRA called MEDEIROS and VIEIRA said that he just "got a, um, 380, banging. It's a little bigger than, ah, Ray's fucking, ah, yo, the same size as 25, the one with the teak handle, the same size." MEDEIROS told VIEIRA

that he had the "vest too, for after Halloween. I'll give you that shit so that for Max." I believe that VIEIRA had purchased another firearm and that MEDEIROS had located VIEIRA's bullet-proof vest.

37. On October 27, 2005, at approximately 7:49 p.m., an outgoing call was placed from target telephone # 3 to 401-413-6158. VIEIRA spoke to an UM. VIEIRA mentioned his maintenance man robbing him and said that if the maintenance man had gone through his drawers at the Target Premises he would have found "twenty-five bricks sitting inside a suitcase." VIEIRA said each "brick" goes for around "twenty-one." I believe that VIEIRA was referring to multiple kilograms of cocaine that he had stashed at the Target Premises.

38. Later on October 27, 2005, VIEIRA spoke to SOARES. VIEIRA told SOARES that he wanted SOARES to sell the .380 caliber handgun to LINDO for $450 or $500.

39. On October 29, 2005, at approximately 12:25 p.m., VIEIRA called LINDO and VIEIRA said that he was going to get the "Mac 11." LINDO asked "where, down here?" and VIEIRA said, "Yah dude, it's a gun store. I'm gonna pick up my man, got his license to carry and he's going with us to pick it up." VIEIRA said that they "gotta stock up" "because when the fuck does this come around that someone's gonna take us to the store shopping, you what I'm saying. We're going all out dog. Fuck that." I

believe that VIEIRA was meeting his firearms supplier to purchase another gun (a Mac 11 semi-automatic machine gun) and that VIEIRA planned to stock up on firearms now that he had a source who could buy directly from stores.

40. On October 29, 2005, Ray DeMELO called VIEIRA and VIEIRA talked about a .380 that he bought and said it looks somewhat like DeMELO's .22.

41. On October 29, 2005, at approximately 4:58 p.m. an incoming call was received on target telephone # 3 from IMSI 316010011156431. VIEIRA spoke to Frank LNU. VIEIRA asked Frank LNU if he was ready to go the store for him to "get the shells for that." Frank LNU said that all of the "spots" were closed now and he would do it Monday. VIEIRA spoke to Frank LNU again and asked him if they have an extended clip, "maybe a ten-shot," for his gun. I believe that Frank LNU is VIEIRA's new firearms supplier; that Frank LNU was planning to purchase ammunition for VIEIRA but all of the stores were closed for the evening so he agreed to do it on Monday.

## C. <u>OTHER INFORMATION RELATING TO THE USE OF THE TARGET PREMISES BY VIEIRA AND SOARES</u>

42. At the outset of the investigation, I interviewed a confidential informant (the "CI") who told me that VIEIRA and SOARES shared an apartment in Rhode Island. In approximately the Summer of 2005, we learned that VIEIRA had bought furniture from Jordan's Furniture for his apartment in Rhode Island. We

obtained information from Jordan's Furniture, pursuant to a search warrant, indicating that VIEIRA had purchased several thousand dollars worth of furniture scheduled to be delivered to the Target Premises.

43. On November 7, 2005, the United States District Court for the District of Massachusetts issued arrest warrants for, among others, VIEIRA, SOARES, and FERNANDES. Agents went to the area of the Target Premises to secure the Target Premises. As they approached the building, they saw an individual whom they suspected was one of the targets of the investigation leaving the building. They stopped him and asked him his name and he said "Matt" and said he was coming from Apartment 413. They subsequently determined that he was Matthew FERNANDES and placed him under arrest pursuant to the arrest warrant from the United States District Court for the District of Massachusetts. In a search incident to arrest, agents seized a large amount of cash wrapped in a bundle from FERNANDES's front pant's pocket.

44. FERNANDES said he was going to meet some people at Fantasy's strip club in Providence. Based on intercepted calls prior to this time, agents had determined that VIEIRA had learned that they may be targets of a federal investigation, that SOARES and VIEIRA were attempting to escape the area, and that SOARES was at Fantasy's in Providence and VIEIRA was trying to arrange to have him picked up. Agents brought FERNANDES up to the Target

Premises and used a key that FERNANDES provided to enter the Target Premises. Agents did a protective sweep of the Target Premises to ensure that no one else was in the Target Premises, then left the Target Premises and secured it from the outside to wait for the issuance of a search warrant.

* * * * *

45. Based on the foregoing, I believe there is probable cause to believe that David VIEIRA and Gary SOARES are engaged in the ongoing business of selling cocaine, that they reside at the Target Premises, and that they use the Target Premises to package their cocaine for distribution.

46. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for individuals who distribute controlled substances to maintain in their residences drugs, drug paraphernalia (such as scales and packaging materials), and records relating to their drug trafficking activities.

47. Because individuals who distribute controlled substances in many instances will "front" (that is, sell on consignment) drugs to their clients, or alternatively, will be "fronted" drugs from their suppliers, such record-keeping is

necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often individuals who distribute controlled substances keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") by the trafficker's suppliers and the trafficker's dealers. Additionally, individuals who distribute controlled substances must maintain telephone and address listings of clients and suppliers. These items are typically maintained at their residences.

48. Based upon my training and experience, I am also aware that it is a common practice for distributors of controlled substances to conceal at their stash locations sums of money -- either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, I am aware that drug traffickers often use safes in their homes to secure their drugs and/or drug proceeds. In this connection also, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug distribution would also typically be maintained in the trafficker's residence.

49. Individuals who distribute controlled substances often stay in contact with their customers and suppliers using cellular or other telephone equipment. Bills, call detail records, statements, and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence and will confirm prior contacts with suppliers and customers. Here, that equipment and those documents are likely to be anywhere inside the Target Premises.

50. During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Firearms have also been recovered during some of those searches and I am aware that drug traffickers frequently possess and use firearms to protect their illegal drug businesses.

51. My awareness of these trafficking practices, arises from my own involvement in prior drug investigations and searches

during my career as a law enforcement officer, my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, and other information provided through law enforcement channels.

52. Based on the forgoing, I believe there is probable cause to believe that David VIEIRA and Gary SOARES are engaged in the ongoing business of selling cocaine, that they reside at the Target Premises, and that they use the Target Premises as a location to package their cocaine for distribution.

**D. <u>ITEMS TO BE SEIZED FROM THE TARGET PREMISES</u>**

53. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth above, I submit that there is probable cause to believe that evidence regarding illegal drug activities will be found in the Target Premises. More specifically, I submit that there is probable cause to believe that the following items of evidence will be found in the Target Premises:

1. Cocaine.
2. Paraphernalia for the packaging, processing and distribution of controlled substances such as cocaine, to include packaging materials, plastic bags and seals, scales, "cutting" agents used to dilute/extend heroin prior to sale, and electronic pagers and cellular telephones used to communicate with drug associates.

3. Books, records, notes, ledgers, and any other papers or records relating to the purchase or distribution of heroin and/or firearms, and/or records or electronic devices reflecting the identity of co-conspirators and drug and/or firearm customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, and/or telephone bills.

4. Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto, or safes for keeping the same. Such items include, but are not limited to jewelry, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

5. Documents reflecting dominion and/or control of 87 Rockland Street, New Bedford, MA, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control by David VIERA and/or Gary SOARES over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Photographs of individuals, property, and/or illegal controlled substances.

8. Firearms, including ammunition, magazines, holsters, and any components of firearms.

Andrew Simmons
Task Force Agent
Drug Enforcement Administration

Subscribed and sworn to
before me, this 8th day
of November, 2005.

DAVID L. MARTIN
United States Magistrate Judge